# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**UNITED STATES OF AMERICA**,

           *Plaintiff*,

v.

**TEMENTA ROBINSON**,

           *Defendant*.

CAUSE NO. 3:21-CR-14-CWR-FKB-2

## ORDER

Before the Court is Tementa Robinson's *Motion for Deviation from the U.S. Sentencing Guidelines*. Docket No. 89. The matter is fully briefed and ready for adjudication. On review, the motion will be granted.

**I.      Factual and Procedural History**

Tementa Robinson is charged with possession with intent to distribute more than 50 grams of methamphetamine. Docket No. 3. He has pleaded guilty to the offense. Docket No. 68. Mr. Robinson does not contest that he is responsible for 214.4 grams of methamphetamine that, when tested, had a purity level between 96% and 97%. Docket No. 89.

At the sentencing hearing, Mr. Robinson's attorney objected to the U.S. Sentencing Guidelines' provisions regarding methamphetamine purity. The Court paused the hearing and asked the parties to provide supplemental briefing on the issue. The present motion, response, and reply followed. Docket Nos. 89-91. A second sentencing hearing is set for January 6, 2023.

The issue is fairly straightforward. The U.S. Sentencing Guidelines use drug purity as a proxy for a defendant's culpability. The Guidelines say, in relevant part, "the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1 cmt. n.27(C). As a result, the Guidelines make a distinction between "methamphetamine" and "actual methamphetamine." *Id.* § 2D1.1(c). All else equal, defendants caught with actual methamphetamine get longer sentences than defendants caught with methamphetamine mixture.[1] *Id.* "No other drug is punished *more* severely based on purity." *United States v. Hayes*, 948 F. Supp. 2d 1009, 1025 (N.D. Iowa 2013) (citation omitted).

The distinction is significant to Mr. Robinson. Because he possessed 214.4 grams of especially pure methamphetamine, the Guidelines indicate that he should have a "base offense level" of 32. U.S.S.G. § 2D1.1(c)(4). In contrast, if Mr. Robinson was deemed to have possessed 214.4 grams of methamphetamine *mixture*, the Guidelines indicate that his base offense level would be 26. *Id.* § 2D1.1(c)(7). Although the six-level difference may not look like much to a layperson, it corresponds to additional months (if not years) in prison.

Mr. Robinson now "respectfully requests this Court reject that purity level distinction in sentencing him because the facts of this case, and all credible data gathered since the time the Sentencing . . . Commission promulgated these rules and related policy statements demonstrate that the purity level of methamphetamine is not indicative of Mr. Robinson's culpability." Docket No. 89 at 3. "Empirical data and national trends bear out, . . . that

---

[1] According to the Guidelines, "[i]n the case of a mixture or substance containing . . . methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the . . . methamphetamine (actual), whichever is greater." U.S.S.G. § 2D1.1(c) n.(B).

2

everyone involved with methamphetamine today, whether a drug lord or an end user, has access to a substantially pure, uncut product." *Id.* at 5 (quotation marks, citation, and brackets omitted).

The United States concedes, as it must, that the Sentencing Guidelines' "Drug Quantity Table weighs 'Methamphetamine (actual)' ten times more heavily than 'Methamphetamine' for purposes of calculating a defendant's base offense level under Section 2D1.1." Docket No. 90 at 3. It nevertheless argues for application of the status quo, emphasizing that (1) Congress "has sought to increase punishments for the distribution of methamphetamine and show its concern for the threat that methamphetamine poses across the United States," *id.* at 7, and that (2) "the United States Sentencing Commission has convened on multiple occasions but declined to make any changes to the Guidelines for methamphetamine and methamphetamine (actual)," *id.* at 10.

In further support of his argument, Mr. Robinson's reply points to DEA data showing that "average meth purity was above 96.2% in 2014, 95.6% in 2015, 95.9% in 2016, 96.2% in 2017, 97.5% in 2018, and 97.2% in 2019." Docket No. 91 at 3-4 (citation omitted).

## II. Law

"The [U.S. Sentencing] Commission was born of congressional disenchantment with the vagaries of federal sentencing and of the parole system." *Neal v. United States*, 516 U.S. 284, 290 (1996) (citation omitted).

> The Commission is directed to "establish sentencing policies and practices for the Federal criminal justice system" that meet congressional goals set forth in 18 U.S.C. § 3553(a)(2) and that, within a regime of individualized sentencing, eliminate unwarranted disparities in punishment of similar defendants who commit similar crimes. See 28 U.S.C. §§ 991(b)(1)(A)-(B). Congress also charged the Commission with the duty to measure and monitor the effectiveness of various sentencing, penal, and correctional practices. § 991(b)(2).

*Id.* at 290-91.

"In the main, the Commission developed Guidelines sentences using an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports." *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (citation omitted). "The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses. Instead, . . . [t]he Guidelines use a drug quantity table based on drug type and weight to set base offense levels for drug-trafficking offenses." *Id.*; *see also Gall v. United States*, 552 U.S. 38, 46 n.2 (2007). This origin story has led criminal defense attorneys to argue, and some judges to find, "that the methamphetamine Guidelines should be given less deference than Guidelines that were properly crafted with empirical data and institutional expertise." *Hayes*, 948 F. Supp. 2d at 1012; *see also United States v. Goodman*, 556 F. Supp. 2d 1002, 1016 (D. Neb. 2008) ("A variance is appropriate in view of the fact that the [methamphetamine] Guidelines at issue were developed pursuant to statutory directive and not based on empirical evidence.").

> Sentencing procedure is well-established.
>
> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.

*Gall*, 552 U.S. at 49–50 (citations omitted). "Indeed, it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

4

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022) (citations, quotation marks, and brackets omitted).

The Supreme Court has repeatedly held that a district court may disagree with the Guidelines range indicated by the drug quantity table where the resulting sentence would be "'greater than necessary' to achieve § 3553(a)'s purposes." *Kimbrough*, 552 U.S. at 110. "[W]ith respect to the crack cocaine Guidelines," for example, a policy-based, "categorical disagreement with and variance from the Guidelines is not suspect." *Spears v. United States*, 555 U.S. 261, 264 (2009) (per curiam). The Fifth Circuit has affirmed policy-based disagreements in methamphetamine cases. *See, e.g.*, *United States v. Valdez*, 268 F. App'x 293, 297 (5th Cir. 2008) (holding, in methamphetamine case, that "the district judge can disagree with the Guidelines' policy that purity is indicative of role or that purity is adequately provided for in [the defendant's] base level.").

**III.  Discussion**

At the outset, the Court appreciates the parties for pointing to Judge Bennett's decision in *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018). In that case, the United States conceded that there is no empirical basis for the Sentencing Commission's 10-to-1 weight disparity between actual methamphetamine and methamphetamine mixture. *Id.* at 950-51. Other courts have found the same. *See United States v. Hartle*, No. 4:16-CV-233-BLW, 2017 WL 2608221, at *2 (D. Idaho June 15, 2017) ("I have tried to determine whether there is any empirical data from the Sentencing Commission or in the academic literature which would justify the ratio. I have found none."); *United States v. Johnson*, 379 F. Supp. 3d 1213, 1223-24 (M.D. Ala. 2019) ("[J]ust as courts have criticized the link between drug quantity and

5

the offender's role, they have also debunked the Guidelines' assumed connection between drug *purity* and criminal role.") (emphasis in original); *id.* at 1226 ("In sum, this court joins other district courts in rejecting the methamphetamine guidelines' 10-to-1 ratio because it is 'based on a flawed assumption that methamphetamine purity is a proxy for role in the offense.'") (quoting *Nawanna*, 321 F. Supp. 3d at 955); *United States v. Carrillo*, 440 F. Supp. 3d 1148, 1157 (E.D. Cal. 2020) ("For the reasons stated above, the court declares a policy disagreement with the methamphetamine Guidelines."); *Hayes*, 948 F. Supp. 2d at 1031; *United States v. Diaz*, No. 11-CR-821-2(JG), 2013 WL 322243, at *16 (E.D.N.Y. Jan. 28, 2013); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017) (finding that the Sentencing Commission's "assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality."); *United States v. Cabrera*, 567 F. Supp. 2d 271, 271 (D. Mass. 2008) (explaining that this Guideline establishes a "false uniformity" by allowing quantity of drugs to mask all other factors).

On review, the undersigned agrees with these colleagues.

The Guidelines use drug purity as a proxy for culpability. But national experience suggests that is no longer true for methamphetamine. The DEA data show that most methamphetamine confiscated today is "pure" regardless of whether the defendant is a kingpin or a low-level addict. *See United States v. Hendricks*, 307 F. Supp. 3d 1104, 1108 (D. Idaho 2018) ("Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution."); *Carrillo*, 440 F. Supp. 3d at 1154 ("Since the Guidelines first took effect, unusually pure methamphetamine has become increasingly more common.").

Given the on-the-ground reality in methamphetamine cases, the better way to determine culpability is to examine all of the circumstances of the defendant's case and life – seeing the defendant as a "whole person," as the Supreme Court just instructed in *Concepcion*. 142 S. Ct. at 2395. There are sentencing enhancements available for leaders, organizers, or managers of criminal enterprises. If the defendant's case warrants, those enhancements should be applied.[2] In the context of methamphetamine, though, purity is no longer probative of the defendant's culpability.

## IV. Conclusion

The motion is granted. Mr. Robinson's base offense level will be 26. The remainder of the sentencing will proceed accordingly.

**SO ORDERED**, this the 23rd day of December, 2022.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[2] On a related note, some courts have noted that drug quantity, too, is a "poor proxy for culpability." *Johnson*, 379 F. Supp. 3d at 1220 (citation omitted). They have observed that "while quantity can reflect culpability or a defendant's role in a scheme, in many cases it does not do so." *Carrillo*, 440 F. Supp. 3d at 1154. In *Cabrera*, 576 F. Supp. 2d at 276-78, for example, the court granted a downward variance when the "delivery man" was apprehended as a part of sting and the quantity he possessed did not reflect his role in the enterprise. Succinctly stated, "[a] more useful factor in determining culpability is not quantity, but role." *Diaz*, 2013 WL 322243, at *13; *see also Johnson*, 379 F. Supp. 3d at 1220.